# McReynolds *et al. versus* Longenberger *et al.*

| 57 | 13 |
| 146 | 455 |

| 57 | 13 |
| 28 SC | 246 |
| 57 | 13 |
| 33 SC | 410 |

1. To authorize a sale of unseated lands for taxes:—the land must be unseated when assessed ; a tax must appear to have been assessed and must in fact have been assessed by the proper officers, the tax must have been due one whole year, and remained unpaid.

2. The want of an assessment in fact by competent authority, is not such an irregularity as is covered by the Act of 1815.

3. Whether a book alleged to contain an assessment on unseated lands, found in an office occupied by the commissioners and treasurer, and requiring extrinsic evidence to identify it, belonged to the commissioners, was a question for the jury.

4. The treasurer is not an assessing officer; his book is not evidence of an assessment.

5. The holder of a tax title when plaintiff, is not entitled under the Act of 1804 to recover after five years without showing requisites.

6. When instruments are more than thirty years old, unblemished by

[McReynolds *v.* Longenberger.]

alterations and found in the proper custody, they prove themselves; and are admissible although the subscribing witnesses are living.

7. It is essential that the instrument be produced from such custody as to afford a reasonable presumption of its genuineness and be otherwise free from just grounds of suspicion.

8. Receipts from a public officer are provable without calling the officer.

9. An administrator in 1863 testified that, being about to apply for an order of sale of his decedent's land, he was informed that it had been sold for taxes; that he thereupon examined the records and also the decedent's title-papers, and found tax receipts for the years from 1816 to 1824, but could not state the name of the treasurer or particulars of the receipts, except that they purported to be treasurer's receipts for the month; that these receipts were burned with his house in 1852. *Held,* that the receipts, which were thirty years old, if produced, would have been evidence without proof of execution; and the testimony was admissible.

January 30th and 31st 1868. Before THOMPSON, C. J., READ, AGNEW and SHARSWOOD, JJ. STRONG, J., at Nisi Prius.

Error to the Court of Common Pleas of *Columbia county:* No. 4, to October Term 1866.

In the court below, William Longenberger and James Macallamy, executors, &c., of George Longenberger, deceased, and S. P. Wolverton, brought an action of ejectment against Hugh W. McReynolds, Michael C. Kreitzer and Mary A. his wife, John W. Phleger and Rebecca his wife, Luther K. Stine and Matilda his wife, Cyrus J. Bower, Franklin C. Bower, Henry Bower, Gibson Bower, Emily Bower, Addison Bower, Mary Bower, and William Bower, for a tract of 364 acres of land in Beaver township (formerly Mifflin township), Columbia county. The writ issued August 1st 1863.

The land was surveyed July 8th 1794, on a warrant to Catharine Longenberger, dated August 28th 1793, patented to James Wilson, September 6th 1794.

The plaintiffs claimed under two treasurer's sales for taxes, and the defendants deduced their title, by a regular chain, from the warrantee.

The cause was tried, May 9th 1866, before Hon. William Elwell, P. J.

On the trial, the plaintiffs offered in evidence a book, designated as the "*bound book,*" alleged to be a record of the county commissioners, of the assessment of taxes on unseated lands of Columbia county for 1818–19. The book contained as follows:—

"Sale of unseated lands for the years 1818 and 1819, June 12th 1820, for taxes—continued until the 19th—expenses included in the purchase-money."

Mifflin township, June 12th 1820.

| Warrantee name. | Acres. | Co'y. tax. | Rd. tax. | Total. | Exps. | Sold. | Purchaser. | |
|---|---|---|---|---|---|---|---|---|
| Longenberger, Cath. | 364 | $1.16 | $1.16 | $2.32 | Paid. | $5.94 | G. A. Frick. | Deed. |

[McReynolds v. Longenberger.]

" Sale of unseated lands opened on the 12th June 1820; continued until 13th; opened again on the 13th and continued until 14th, at 10 A. M.; continued until 16th; then continued until the 17th, and continued until 19th June 1820, and sale commenced and continued until the 20th and finished.   The sum for which the land sold for and carried out, is intended for the taxes and costs included."

Also deed dated July 10th 1820, from William Wilson, treasurer for the Catharine Longenberger tract, reciting—taxes of 1818, 58 cts.; 1819, 58 cts.; road-tax, 1818, 58 cts.; 1819, 58 cts. Total, $2.32.   Sold June 19th, 1820, to George A. Frick, for $5.94.

Also from appearance docket:—

" Deed acknowledged in open court at Danville, on the 12th of August 1820, by William Wilson, treasurer of Columbia county, for lands sold for county and road taxes by him in June 1820; deed dated 10th of July 1820.   Among the grantees, George A. Frick, 364 acres; warrantee, Catharine Longenberger, Mifflin township.   Sold June 19th—amount county taxes, $1.16; road taxes, $1.16; purchase-money, $595."

The certificate of the acknowledgment of the deed, appeared to have been made by Frick, the purchaser, who was the prothonotary of the court.

The defendants objected to the offer, because—

1. No assessment of county and road taxes for 1819, is shown to have been made by the county commissioners.

2. The certificate of the acknowledgment of the deed is by George A. Frick, the purchaser, who is the prothonotary.

The plaintiffs then called Robert C. Frink, the clerk of the commissioners, and assistant treasurer, who testified that the book belonged to the commissioner's office; that it was both the assessment and treasurer's sale-book—" that is the parts which relate to the Catharine Longenberger tract as read"—that there was nothing in the book to indicate an assessment; that the books of the treasurer are kept in the commissioner's office; and that the book was in his possession as clerk, and as assistant treasurer; that there was no other book showing an assessment or sale for Mifflin township, for 1818, 1819 and 1820, to be found in the commissioner's or treasurer's offices.

They also called William G. Hurley, Esq., a member of the bar, who had lived in the county since 1816—who testified that he had examined the commissioner's and treasurer's offices, frequently; that the entry " is the assessment made by the commissioners, it passed into the hands of the treasurer, and the column left for the name of the purchaser; * * * the name of the purchaser was filled in by the treasurer;" that the whole line was in the handwriting of Wilson, the treasurer; that the book was the sale-book of the treasurer.   He also testified that he, with

[McReynolds *v.* Longenberger.]

Frink, had seen an assessment for 1818 or 1819 in another book. Frink, who was recalled, thought that the book offered was the same book that he and Hurley had seen together.    They also offered triennial assessment of Mifflin township for 1817, " Catharine Longenberger $364, rate $1 per acre, $3.64; G. Longenberger tax 51 cts."

They also offered from the other end of the book :—

" Return of unseated lands made by the assessor of Mifflin township for 1817,

| Warrantee. | Acres. | County tax. 1817. | Road. 1817. | County. 1818. | Road. 1818. | County. 1819. | Road. 1819. |
|---|---|---|---|---|---|---|---|
| Longenberger, Cath. | 364 | 51 cts. | 58 cts. | | 58 cts. | | |

Hurley further testified, that he had compared the assessment in the book of which he had last spoken, with the treasurer's deed to Frick, and that the deed recited the assessment correctly.

After some further evidence of the same character on this point, the plaintiffs again offered the treasurer's deed of July 10th 1820, with the record of the acknowledgment.    The offer was objected to by the defendants, but admitted, and a bill sealed.

The plaintiffs offered in evidence the following entry from another book :—

" Return of unseated lands in Mifflin township for 1820,

| Warrantee. | Acres. | 1820. County tax. | Road tax. | 1821. County tax. | Road tax. | Remarks. |
|---|---|---|---|---|---|---|
| Longenberger, Cath. | 216 | $1.07 | | 53½ cts. | | G. A. Frick. |

and recalled Frink, who testified that the book came from the commissioner's office; that the treasurer had the same access to it as the commissioners; that he could not tell whether it had been made by the commissioners or treasurer.

They then offered a deed dated August 5th 1822, from William Wilson, treasurer, to George A. Frick, for a tract in the warrantee name of Catharine Longenberger, containing 216 acres, sold for $5.32, June 10th 1822, for county tax of 1820, $1.07, 1821, 53 cts., amounting to $1.60—acknowledged in open court August 15th 1822.

This offer was objected to by the defendants, because—

" 1. The plaintiffs have not shown such an assessment by the commissioners, as would authorize a sale by the treasurer."

" 2. That the book given in evidence does not show an assessment by any person for 1820.

[McReynolds *v.* Longenberger.]

" 3. The sale was made for *road taxes*, and no assessment is shown for road taxes for those years.

" 4. The treasurer was not authorized to make sale on the 10th of June 1822."

The evidence was received, and a bill of exceptions sealed.

The plaintiffs gave in evidence a deed dated July 24th 1843, from George A. Frick to Arthur W. Frick, and sundry other conveyances vesting the title of Frick, March 29th 1851, in Abraham Klase; also the record of an ejectment for the tract, brought April 20th 1851, by Abraham Klase against Charles F. Mann and Joshua Robinson, and award of arbitrators for the plaintiffs, May 27th 1851; they also gave evidence tracing the title of Klase to the plaintiffs, and rested.

The defendants gave in evidence the patent to James Wilson, for the tract in dispute, and a sale of this tract, with others, by the sheriff to Jacob Bower, on an execution to April Term 1801, against Wilson's executors; also an exemplification from the sheriff's deed-book of his deed to Jacob Bower, dated November 25th 1801.

They gave evidence also of the loss of the sheriff's deed by being burned; also sale of the land by the sheriff for taxes as the property of Jacob Bower to Marks J. Biddle, on the 27th of August 1806.

Also, mortgage dated November 20th 1802, from Jacob Bower to William Bell and Marks J. Biddle, on the several tracts of land conveyed by the sheriff to Bower; also deed Henry Bower to Simon P. Kase, dated July 3d 1837, for one-third of the tract in dispute, with deed endorsed on it, dated November 21st 1859, from Kase to Hugh W. McReynolds, for the same property; also, deed of May 30th 1863, from Samuel Bell to H. W. McReynolds, for one-third of the land in dispute; deed of same date from Samuel Bell to the heirs of Henry Bower, deceased, for two-thirds of the tract, and deed of June 9th 1863, from the heirs of Marks J. Biddle to heirs of Henry Bower, for two-thirds of the tract.

The defendants asked to read the recitals, alleging that there had been a conveyance by Bell and Biddle to Henry Bower, the only heir of Jacob Bower, which had been destroyed by fire; and that the deeds in evidence were confirmations. The court excluded the recitals, but allowed the residue of the deeds to be read, and sealed a bill of exceptions.

The defendants then offered to read the deposition of Christian Shrack, taken under cross-examination March 30th 1866. The deposition is as follows :—

" I was one of the acting administrators of Dr. Henry Bower, deceased. Dr. William Bower was the other, I am the only surviving administrator. The papers of the said estate were left

7 P. F. Smith—2

[McReynolds *v.* Longenberger.]

with me, they were in my possession about fourteen years, until my house was burned in 1852, on the 29th day of February. I had the deeds and title papers and tax receipts for several tracts of land in Columbia county, of the estate of Dr. Henry Bower, deceased. I had also a number of deeds in the same package, one of which was a deed from Bell and Biddle to Dr. Henry Bower. The sheriff's deed from Northumberland county bore date about 1800. The deed from Bell and Biddle to Dr. Henry Bower bore date about 1830. These deeds were all for lands in Columbia county. [We had an order from the Orphans' Court of Columbia county for the sale of Dr. Henry Bower's land in 1842.] The conditions of sale shown witness. This condition of sale is in my own handwriting and is marked *C*. [We did not sell those lands at the time they were offered, in 1842, on the 1st day of June. One of the tracts we offered for sale was in the name of Catharine Longenberger, in pursuance of the order of sale from Columbia county. Whilst I was in Columbia county], I learned that there had been a treasurer's sale of the Catharine Longenberger tract of land about the year 1820. I can't say that I examined the tax sales. I had them examined. [But when I returned home we examined the tax receipts for the Catharine Longenberger tract of land, and found the tax receipts for said lands for the years 1816, '17, '18, '19 and '20, and up to '24, for state, county and road taxes. Therefore we came to the conclusion that we had a perfect title. The deeds and title show that Bell and Biddle had owned the lands from about 1812, or before, up to 1830, or thereabout. We examined all the deeds and tax receipts before we offered the land for sale at Reading. The tax receipts appeared to come from the proper officers of Columbia county. The deeds and tax receipts were all in one bundle, and were laid on the top of my cupboard, in the back room, and were all burned. They were all together,— the title papers of Henry Bower's lands in Columbia county. The conditions of sale were in my desk in another room, which was saved with the desk. Bell and Biddle had a claim against Dr. Henry Bower for these lands. When he died I paid $500 to Mr. Bell on account of the purchase. Afterwards they brought suit against us as administrators, and obtained a judgment for the balance. We then settled with Bell and Biddle, and paid them $400, and they satisfied the judgment. Mr. Biddle was a lawyer, and lived in Reading at the time. I had a great many papers and tax receipts of Messrs. Bell and Biddle, and they appeared very regular."]

Being cross-examined, he said: "I am seventy-two years old; William Bower died in 1860; Henry Bower died in 1838; I do not recollect all the names of all the tracts of land which the sheriff of Northumberland county conveyed to General Jacob Bower; I don't recollect the name of the sheriff; I do not dis-

[McReynolds v. Longenberger.]

tinctly know whether the land sold by the sheriff of Northumber-
land county was for tax or not, to General Jacob Bower; the deed
would show how many tracts there were; I cannot say whether
the deed was recorded by the prothonotary or the recorder; I
cannot say in what county the deed was recorded, but think it
was recorded in Northumberland county; to the best of my know-
ledge there was more than one sheriff's deed in the package of
deeds that were burned; I cannot tell by whom I was told the
lands were sold for taxes; I had heard it when I was up in Co-
lumbia county, that some of the lands were sold for taxes; the
Catharine Longenberger tract was one; I did not go on the lands;
I was first in Columbia county in 1841 or '42; I do not know, of
my own knowledge, whether anybody was living on those lands
at that time.  [We had a tax receipt for the year 1823, and the
receipts from 1816 up to 1824; I cannot tell by whom the tax
receipts were signed of 1823; we had more than one tax receipt
for the year 1823; I cannot recollect whether it was in one paper
or more; it might have been all in one paper, that is, state, county
and road taxes.  The lands were owned by Bell and Biddle at that
time, and the tax receipts for the year 1823 had been given
to them.  I cannot name the parties that signed the receipt.
All the tax receipts we had for the land in Columbia county
were given to Bell and Biddle, and afterwards were handed
over to Dr. Henry Bower, with the title-papers.  I do not
know the names nor can I recollect, now, the names of the
parties that received the money; I do not know the persons
who received the taxes for the year 1823, nor the proper officers
to collect taxes; I do not know personally the parties who
signed the receipts for that year; I had the receipts on said lands
from 1816 up to 1824; I had the receipt for the road taxes for
the year 1819 for the said land in question; I cannot recollect
whether there were any poor taxes assessed on that land for the
year 1818; I have stated that we had the tax receipts for state,
county and road taxes, for the year 1818.  We had the tax receipts
for all the taxes assessed upon that property, from 1816 up to 1824;
I do not recollect the name of any person who signed the tax
receipts, nor do I recollect the amount of any of those tax receipts;
I do not know, of my own knowledge, that any of those persons
whose names were to those receipts had legal authority to receive
the taxes, but I presume they had, for Bell and Biddle were very
correct business men.  These receipts were all taken during the
time from 1816 up to 1824, were during the time Bell and Biddle
were owners of the lands; I do not know, personally, anything
about those receipts, except seeing them in the bundle among the
title-papers, which came into my hands as administrator of the
estate of Henry Bower, deceased."]

[McReynolds *v.* Longenberger.]

Being re-examined he said: "The sheriff's deed showed that the tract called Catharine Longenberger, with other tracts, was levied upon as the property of James Wilson, on a judgment obtained against James Wilson or his administrators, about that time, and the said lands above referred to were sold to General Jacob Bower by the sheriff of Northumberland county, about the year 1800. Also, there were some tax title-papers among the deeds that were burned, made to Bell and Biddle, or one of them. I have reference to the titles in Northumberland county."

["S. P. Kase acted as agent for Dr. Henry Bower, deceased, and his estate. Mr. Kase informed me, when I was there in 1841 or 1842, that we were in possession of the lands in Columbia county, and had leased a part. Cannot recollect what tracts of said lands were leased."

Being re-cross-examined, in answer to the question: "Do you know, of your own knowledge, whether Kase and Bower were in possession of those lands in Columbia county, or not?"

He said: "I don't know, of my own knowledge; I never have been on the property, but from the general character of Mr. Kase I have reason to believe what he told me."]

The deposition was offered to show "possession of Henry Bower and his legal representatives and those under whom they claim of the title-deeds and muniments of title of the premises in dispute up to the year 1852, including the receipts for the taxes, for the non-payment of which the plaintiffs allege the said tract was sold by the treasurer of Columbia county in 1820 and in 1822. That the said deeds, muniments of title and tax receipts aforesaid, and in said deposition referred to, were destroyed by fire in February 1852, payment by those under whom defendants claim of all the taxes from the year 1816 to the year 1824, assessed upon said tract of land in the name of Catharine Longenberger, and payment by the heirs of Henry Bower, deceased, of all the claim and demand which Marks J. Biddle and William Bell held against the said tract."

The plaintiffs objected to the deposition, because the defendants had not shown the existence of any tax receipts, and it contained no evidence that such receipts had been given; because the deposition shows that the witness had no knowledge to enable him to speak of tax receipts on the tract; because the possession of the muniments of title, other than tax receipts by Henry Bower, &c., and the payment of money to Bell and Biddle by Bower's heirs, and that the title-deeds, &c., except the tax receipts, had been burned were irrelevant; because the allegation that *all* taxes for certain years had been paid, was not evidence of payment on the tract in question; because the witness did not know the name or handwriting of any officer who signed the receipts; because "exhibit C." could be evidence for no purpose but to fix

a date, and because the witness did not know the names or quantity of the tracts on which the taxes were alleged to have been paid.

The court rejected the parts of the deposition included in brackets and admitted the rest, and, at the request of the defendants, sealed a bill of exceptions.

The defendants then called Daniel Hantz, who testified that he went on the tract about 1832 without knowing any owner for it, and in 1835 took a lease of it from Simon P. Kase and William Bower, and lived on it until 1840, when William McAfee moved there under a lease by Kase, as attorney for Henry Bower, for one year, for the rent of $5. Kase testified that William Bower, a son of Henry Bower, took the lease which had been made to Hantz in 1835; that after William Bower's death he searched his papers and the papers of Mr. Shrack as administrator, but could not find it.

The defendants again offered the rejected portions of the deposition of Shrack, in connection with the record, showing an application by the administrators, &c., of Henry Bower, to the Orphans' Court of Columbia county for an order of sale of Catharine Longenberger tract.

The plaintiffs objected to the offer, and the court rejected the deposition, but admitted the records of the Orphans' Court, and, at the request of the defendants, sealed a bill of exceptions.

The records showed a petition of the administrators, &c., of Henry Bower, setting out that they had petitioned the Orphans' Court of Lebanon county (where Henry Bower died), representing that he had died intestate, leaving certain heirs and seised of two undivided third parts of several tracts of land in Columbia county, the Catharine Longenberger tract being one; that his personal estate was insufficient to pay his debts and maintain and educate his minor children, and asking the court to authorize them to raise as much money from the sale of the real estate aforesaid, as the court might deem necessary, &c., and that the Orphans' Court of Lebanon county, on the 21st of March 1842, authorized them to raise $1200, from the sale of the said land, and praying the Orphans' Court of Columbia county for an order to sell so much of the land above described as the court might deem necessary.

The order was granted and the land was exposed to sale on the 1st day of June 1842, under the conditions referred to in the deposition of Shrack as "exhibit C."

The administrators returned, January 3d 1843, that the land was unsold for want of buyers.

The defendants also proved the death of William Wilson, the county treasurer, about 1836 or 1837.

The defendants rested, and the plaintiffs in rebuttal gave in

[McReynolds *v.* Longenberger.]

evidence the record of an action of ejectment for the Catharine Longenberger tract, by George A. Frick against Daniel Hantz, commenced June 1st 1840. Mr. Comley appeared for the defendants, and after pleading "not guilty," on the 16th of November 1841, on leave given, he withdrew his appearance and plea, and judgment was entered for the plaintiff; also an habere facias issued October 24th 1842, endorsed on the writ, "sheriff to deliver possession to William McAfee, Sr.," returned "executed by delivering possession to William McAfee as directed by the plaintiff;" also an ejectment to January term 1845, by Arthur W. Frick against William McAfee, for this land, in which after a rule to plead, judgment was rendered, April 23d 1846, for the plaintiff, and an habere facias was issued which was returned "stayed." They also gave evidence that Joshua Robison came into possession of the tract after William McAfee, and lived in a house built by Kase.

There was much more evidence given by both parties, cumulative of that above stated.

The defendants asked the court to charge :—

"3. That the plaintiffs have not shown an assessment sufficient in law to authorize the sale by the treasurer to George A. Frick, in 1820, of the lands claimed by them in this suit against the defendants, the holders of the original title, to the Catharine Longenberger survey.

"4. That the burden of proving that a legal assessment was made is upon the plaintiffs, and they must satisfy the jury affirmatively that the taxes for which the land was sold were so assessed by the proper officers more than one year before the sale, and remained due and unpaid upon the commissioners' assessment book at least one year before the sale.

"5. That the county treasurer had nothing to do with the assessment of the taxes in any of its stages, and nothing contained in the books of the treasurer of Columbia county can be regarded by the jury as affording any evidence of the assessment of the taxes for either of the years alleged by the plaintiffs to have been unpaid.

"9. That the plaintiffs have not shown a return of the road tax into the commissioners' and treasurer's office, one year before the sale, by the treasurer, to George A. Frick, in 1820. Therefore the sale conferred no title to the purchaser.

"10. That the treasurer of Columbia county was not authorized to advertise unseated lands for sale, for non-payment of taxes, upon the 10th of June 1822, and the deed from William Wilson, treasurer, to George A. Frick, Esq., is void, and passed no title to the purchaser as against the defendants in this case.

"11. That neither the books given in evidence by the plaintiffs, nor any other evidence in the cause, show a valuation or legal assessment of taxes by the county commissioners, for the

years 1820 and 1821, one year before the sale, and the sale of 1822, by William Wilson to George A. Frick, is therefore void, as against the defendants, in this case.

"12. That inasmuch as the only evidence of the fact of the sale of the Catharine Longenberger tract, in 1822, shows that it was made for the non-payment of road taxes alone for the years 1820 and 1821, and as no road taxes are alleged to have been assessed or to have been due for those years or either of them, the said sale by the treasurer, upon the 10th day of June 1822, was void.

"13. That the plaintiffs, not having given in evidence a sale book, or other sufficient evidence that a sale for non-payment of taxes was made to George A. Frick, Esq., by the treasurer, in June 1822, the sale is invalid, and passed no title to the purchaser."

The court charged:—

"This is an action of ejectment for a tract of land, in the warrantee name of Catharine Longenberger, containing 364 acres, situate in Beaver, formerly Mifflin township, in this county. The plaintiffs claim title under sales for taxes by the treasurer to George A. Frick, in 1820 and 1822.

"The defendants are in possession and claim title to the same warrant and tract of land by virtue of a patent from the Commonwealth to James Wilson, dated September 6th 1794. * * *

"The plaintiffs have by competent evidence and a regular chain of conveyances, traced the title of George A. Frick to themselves. They were therefore the owners of the tax title.

"The defendants have deduced the title from the patentee to themselves, and unless the tax sales divested that title from the then owner they have the legal title and right of possession.

"It is shown by the triennial assessment of 1817, here produced from the commissioners' office, that the tract in the warrantee name of Catharine Longenberger, 364 acres, was returned by the assessor of Mifflin township as unseated. It was rated at $1 per acre, valued at $364, and charged with county tax, for that year, 51 cents. This was a regular assessment, and furnished the basis of taxation for the years 1818 and 1819.

"In the bound book, also from the commissioners' office, in that part of which is written across the page, and headed unseated lands in Mifflin township, upon all the tracts of unseated lands in Mifflin township returned by the assessor for 1817, we find county taxes charged upon all the tracts of unseated lands in Mifflin township, upon the page preceding that upon which the Catharine Longenberger and a large number of other tracts appear. There is a column, headed road tax, upon all the pages, but no road tax set down under that head in the preceding pages, but upon the page where the name of Catharine Longenberger

[McReynolds *v.* Longenberger.]

tract appears. The tax which is most manifestly the county tax for 1818, is put down under the head of road tax 1817, and the county tax for 1819 is placed under the head of road tax, 1818. This was a mistake of the clerk, which clearly appears by inspection of the book. The taxes upon that page were carried to the wrong column in making out the list.

" On the 19th June 1820, as appears from the treasurer's list of sales contained in another part of the same book, but written lengthwise instead of across the page, this tract was sold to George A. Frick for $1.16, county, and $1.16, road, tax.

" On the 20th July 1820, the treasurer made his deed, which recites county and road taxes of 58 cents for both the years 1818 and 1819. It also recites that these were overdue one year at the time of sale. The assessment of 1817, and the bound book, although the treasurer's sales for 1820 are entered in the back part of the latter, contain within themselves sufficient primâ facie evidence of an assessment by the commissioners to authorize the sale by the treasurer in 1820.

" The parol evidence in regard to another book, containing an assessment for the years 1818 and 1819, is not sufficient to support the sale. The validity of the sale depends entirely upon the documents from the commissioners' office and the deed of the treasurer.

" It appears by these that this land was assessed as unseated. That the taxes were charged and overdue more than one year before the sale. From this sale there was no redemption, nor offer to redeem, within two years. The title of the purchaser therefore at the end of that time became perfect.

" In a book from the commissioners' office, headed return of unseated lands made by the assessor for Mifflin township 1820, we find Catharine Longenberger assessed as 216 acres adjoining A. Clark, as in the survey returned. It was assessed with county tax, 1820, $1.07, and county tax, 1821, 53½ cents.

" On the 10th day of June 1822, as appears by the deed of the treasurer, dated 5th of August 1822, and duly acknowledged in open court, the tract was sold again to George A. Frick for taxes, $1.60; amount of sale $5.32.

" Under the view which we take of the sale of 1820, we can submit no question to you as to what taxes are recited in the deed of 1822. Taken in connection with the assessment, there can be no doubt that the sale was made for the county taxes, and so intended to be recited in the deed.

" We hold the sale of 1822 to be a valid sale, and under the evidence of recoveries in ejectment by the parties holding that title, and the lapse of time, we instruct you that it vested a title in the plaintiffs indefeasible by the original owners.

[McReynolds v. Longenberger.]

" We read to you and answer the points presented by the counsel for the defendants as follows :—

" 1. This is correct unless the title was divested by the sale for taxes to George A. Frick in 1820 or 1822.

"; 2. Answer in the affirmative.

" 3. We decline to charge as requested.

" 4. It is a correct proposition that the burden of proof of a legal assessment is upon the plaintiff. We have stated in the general charge that the evidence of the plaintiffs established such an assessment.

" 5. Answer in the negative.

" 6. We have said in the general charge that the plaintiffs have not proved any legal assessment by parol evidence.

" 7 and 8. No answer required.

" 10, 11, 12 and 13. Points are all negatived in the general charge.

" Upon the whole case we instruct you that the plaintiffs are entitled to recover, and the verdict should be in their favor."

The verdict was for the plaintiffs.

The defendants removed the case to the Supreme Court, and assigned the following errors.

1. Admitting in evidence the deed of July 10th 1820 from William Wilson, treasurer, to George A. Frick, and the record of its acknowledgment.

2. Admitting the deed of August 5th 1822 between the same parties.

3 and 4. Not admitting all the deposition of Christian Shrack, as it was twice offered.

5, 6, 7, 8, 9, 10, 11 and 12. The answers to the defendants' 3d, 4th, 5th, 9th, 10th, 11th, 12th and 13th points respectively.

13. In charging that the plaintiffs were entitled to recover.

*J. B. Packer*, for plaintiffs in error.—To authorize a sale of unseated lands for taxes, there must have been an assessment by the county commissioners more than one year before the sale; a party claiming under a treasurer's sale must show such an assessment, and that the taxes remained due and unpaid for a year before the sale: Bratton *v.* Mitchell, 1 W. & S. 310; s. c. 7 Id. 259; Miller *v.* Hale, 2 Casey 242; M'Call *v.* Lorimer, 4 Watts 353; Laird *v.* Hiester, 12 Harris 452; Stewart *v.* Shoenfelt, 13 S. & R. 372. The book given in evidence by the plaintiffs was the treasurer's sale book, manifestly so designated at the caption of the list containing the name of Catharine Longenberger. There was no evidence showing that the other entry referred to by the judge was the work of the commissioners. The entry was not an assessment. The Act of April 11th 1799, 4 Dallas' Laws 508, requires a valuation: there was none 'here,

and as the presumption is that public officers do their duty, the entry could not have been the work of the assessor or commissioners.

But if the entry was erroneous, as assumed by the judge, a sale based on such entry would not be valid, for the owner would thus have his land sold without notice that the taxes were unpaid. The 5th and 7th sections of the Act of April 6th 1802, 3 Sm. L. 512, and the 1st section of the Act of March 30th 1811, 5 Id. 251, require an assessment of road taxes by the supervisors and a return to the county commissioners, one year before the sale, of which there is no evidence in the case. As to the sale of 1822, there was no sale-book given in evidence, showing the purchaser's bid, the amount of the taxes due, or when the sale was made, and the treasurer's deed could not be set up against the defendants. The treasurer's book is no evidence of an assessment.

By the Act of March 13th 1815, § 1, Purd. 992, pl. 18, 6 Sm. L. 299, the treasurer could not advertise unseated lands for sale until the expiration of every two years after the second Monday, which was the 10th of June 1816, and the first biennial period would not expire till the end of the 10th of June 1818, so that the sale could not be advertised until the 11th, and so in subsequent years, and therefore the advertisement upon the 10th of June 1822 was too early, and the treasurer's deed was void: Cromelein *v.* Brink, 5 Casey 522; Marks *v.* Russell, 4 Wright 372; Act of March 29th 1824, § 5, Purd. 992, pl. 19; 8 Sm. L. 291.

The deposition of Shrack should have been received. If the tax receipts purporting to have been executed by a public officer had been offered, they would have been admitted without proof of their execution as ancient papers, being produced from the proper custody: 1 Greenl. Ev. § 21, 142, 570; 1 Starkie on Ev. pp. 292, 521, 524; Bertie *v.* Beaumont, 2 Price 303; Bullen *v.* Michel, Id. 399; Wynne *v.* Tyrwhitt, 4 B. & Ald. 376; Dean of Ely *v.* Stewart, 2 Atk. 44; Manly *v.* Curtis, 1 Price 225; Law *v.* Mumma, 7 Wright 267. If the receipts would have been evidence, then, if they had been lost, their contents could have been proved. The extent and accuracy of the information of the witness were for the jury.

*G. B. Nicholson* and *L. Hakes*, for defendants in error.—The judge below properly decided upon an *inspection* of the books as to the assessments.

The defendants first allege that there was no assessment of taxes, and then take the ground that they had paid the taxes assessed for 1818 and 1819. They attempt to prove this by the deposition of Shrack. He does not recollect the name of any person who signed the receipts, nor their amount, nor that the persons signing had authority to do so, nor anything about them, ex-

[McReynolds v. Longenberger.]

cept that he saw them in a bundle of title papers of Henry Bower. The admission of papers because ancient, presupposes that a document is produced, but the witness here did not pretend that he saw a paper purporting to be signed by Wilson, the treasurer, nor did he give any evidence of knowledge of the *contents* of any of the papers; his deposition was therefore properly rejected.

The opinion of the court was delivered, March 19th 1868, by

THOMPSON, C. J.—It was said in Laird *v.* Heister, 12 Harris 452, that the authority of the treasurer to sell unseated lands for taxes depends upon facts; viz., that the land was unseated at the time of the assessment: that a tax appears to have been, and was in fact assessed upon it by the proper assessing officers, and that the tax has been due for one whole year, and remains unpaid. The absence of either of these facts involves an exemption from the penalties of the Acts of 1804 and 1815. The substance of this is to be found in many cases prior and subsequent to that decision.

The want of an assessment in fact, by some competent authority, is not such an irregularity as is cured by the Act of 1815: Stewart *v.* Shoenfelt, 13 S. & R. 360; Bratton *v.* Mitchell, 1 W. & S. 310; Miller *v.* Hale, 2 Casey 432. It is an essential to a valid sale, and the want of it is more than a mere irregularity.

Was there such an assessment shown by the plaintiffs below? The learned judge who tried the case ruled, as a matter of law, that there was, and this ruling is the foundation of one of the principal errors in the case; and, although not first in the order of presentation, will be first considered.

The document of which this ruling was predicated is before us, and we are not able by inspection to see on its face the evidence of a valid and legal assessment of the taxes of 1818 and 1819, for which the land in controversy was sold by the treasurer of Columbia county in 1820. The book containing the list in which the Catharine Longenberger tract is found charged with the county taxes for these years, does not in any part express that it is the unseated land book of the county, nor that it is a transcript of the unseated lands furnished by the commissioners to the treasurer for those years. No warrant to the treasurer to sell accompanies the list. The list is not identified by intrinsic evidence as the work of the commissioners or their clerk; neither the names nor the handwriting of either are shown upon it. It seems to us, therefore, that in the absence of all evidence of identity it was not competent for the court to declare it a list of unseated lands, showing a legal assessment of these taxes by the commissioners. But it is claimed on part of the plaintiffs that there was extrinsic evidence to identify the book as belonging to the commissioners' office, and as containing a list of unseated lands made out by their

[McReynolds *v.* Longenberger.]

direction, with the taxes carried out by their authority, because produced from the commissioners' office. Even granting this, it would have been for the jury to consider and pass upon the testimony, especially as it was shown that the office in which it was found was also the treasurer's office. The custody of the book was equivocal. It was not even primâ facie therefore, the commissioners' book from this circumstance, so as to authorize the court in assuming it so to be. On the face of the book it bore unmistakable evidence that it was a treasurer's book, for it contained the treasurer's sale lists for the years 1820 and 1822. If it was the latter, and the *extrinsic* evidence was equally strong that it was, as that it was the former, and the *intrinsic* evidence being stronger, it was not to be assumed by the court as evidence of a valid assessment. The treasurer is not an assessing officer, nor is his book evidence of an assessment: Bratton *v.* Mitchell, 7 W. & S. 259. Standing thus, it required proof to establish it to be an unseated land book, or list, furnished by the commissioners, and the proof was for the jury. Indeed, it seems to me that its character as primâ facie a book of the commissioners' office, or list furnished the treasurer by them, is to be somewhat affected by the fact that no road taxes appear on it for the years 1818 and 1819. It can hardly be that no transcripts were returned by the supervisors. This could take place only on the supposition that no taxes had been laid for township purposes in those years, or that it had all been paid, which on unseated lands at that period, would have been very extraordinary.

We are, therefore, of opinion that the court erred in treating the book in question, under the circumstances, as sufficient evidence of an assessment of the taxes for 1818 and 1819, and in receiving the deed for the land in question without proof of an assessment. It was receivable only on an offer to follow it by proof of a legal assessment. That was not proposed. There was no error in receiving the testimony of the custody of the book, and from whom it was produced; but as that did not aid the book, the deed was not receivable without something more definite. This sustains the 1st assignment of error. These views also sustain the 5th, 6th, 7th, and 8th assignments of error, being answers of the court, on the hypothesis that the book in question was in itself primâ facie evidence of a valid or sufficient assessment of the taxes on the Catharine Longenberger, for the years 1818 and 1819; and we need no further elaborate our views on the question.

2. The learned judge received the treasurer's deed to Frick, under the sale in 1822, for the taxes of 1820 and 1821, without question as to the assessment, and held it indefeasible by the defendants, "under the evidence of recoveries in ejectment by the parties holding title, and the lapse of time." It would have been

[McReynolds v. Longenberger.]

satisfactory to have had the views of the learned judge on these points more in extenso. The defendants were in possession under the original warrantees, and could only be dispossessed by force of a better title. If anything was predicated of the sale in 1820, as divesting that title and reducing the occupants to the position of mere intruders, we have seen that that sale had not that effect; itself being, as it appeared below, for want of requisites, without effect. The "lapse of time" spoken of, I suppose, has reference to the Act of 1804, and not to the law arising under an adverse possession for twenty-one years. Nothing like the latter appears in the case. If the former was in the mind of the learned judge, then the inquiry follows:—Is the holder of the tax title, when plaintiff, entitled after five years to recover without showing requisites? In view of the act and the decisions under it, we think not. The words of the statute illustrate this. They are: "No action for the recovery of said land (land sold for taxes) shall lie, unless the same be brought within five years after the sale thereof for taxes, as aforesaid." No suit against the owner of the tax-title by the original owner, whether the latter be in or out of possession, will lie after five years. But the owner of the tax-title may bring suit against the original owner at any time—but then he must show requisites; that is, that there was an assessment of the taxes by some competent authority; that they were due over a year, and remained unpaid when the sale took place. It may not be inaptly said, that the statute operates to paralyze the activity of the original title as an assailant of the tax-title after five years. But when the tax-title becomes the assailant, such is not the case. It must then come backed by the authority of the law in the requisites necessary to be shown. This is the rule laid down in Bigler v. Karns, 4 W. & S. 137; Hole v. Rittenhouse, 7 Harris 305; and Sherman v. Woodburn, 10 Barr 511. On these grounds we see no good reason for the view taken by the learned judge. Whether the sort of recoveries had under the Frick title ought to have any effect to vary the rule, we need not say conclusively at this time; but it strikes us, the principle is not varied by them. We do not see that the plaintiffs' tenants were fraudulently induced to attorn to the defendants. If there was anything of that, it does not appear at this time.

This deed was not entitled, in our opinion, to be received and to have the effect allowed to it in the charge, as the case stood on the trial below. We have not omitted to notice the special objection, that the deed recites a sale for road taxes, when the book, the only evidence on the subject, showed that no road taxes were returned for the years 1820 and 1821. We have not been able to discover the erasure of this recital in the deed, so as to make it read a sale for county taxes. Even supposing the book evidence, which without extrinsic support we do

[McReynolds *v.* Longenberger.]

not think it was for the reasons given, there was no assessment to support that sale, if we are right in regard to the first deed. We think, therefore, the 9th, 10th, 11th and 12th assignments of error are sustained; and this leads inevitably to the conclusion, that the 14th is also sustained, which is to the charge wherein the jury was instructed, " that upon the whole case the plaintiffs are entitled to recover, and the verdict should be in their favor."

3. We agree there was a change in the terms used in the Act of 1815, as to the time for commencing the sales of unseated lands by the Act of 29th March 1824. In the first of these acts, the sales were to commence at the expiration of every two years after the second Monday in June 1816; and in the latter act, the provision is to commence the sales on the second Monday of June every two years. No distinction in fact has ever been made, or attempted before, between these acts in practice, so far as our experience goes, and if there be any, we regard it as a mere irregularity, and cured by the Act of 1815. . This error is not sustained.

3. The 3d assignment of error remains to be noticed. It presents a point of some novelty and importance in cases of this description. It arises on the rejection of that portion of the deposition of Christian Shrack, Esq., one of the administrators of Dr. Henry Bowers, deceased, under whom the defendants claim title, and was offered to show the existence of treasurer's receipts for the payment of the taxes for the years for which the land in controversy was sold, as claimed by the plaintiffs. The proposition was to prove ancient receipts—receipts more than thirty years old, accompanying the muniments of title to the land, and found with them by the witness, when he received the title-deeds, and which were retained by him until his house was accidentally burned in 1852, being a period of fourteen years. Was this competent? The learned court thought not.

The witness in substance testified that in 1841 or 1842, about the time an order for the sale of this land was obtained in the Orphans' Court of Columbia county, he was in that county, and while there was informed, or heard, that the Catharine Longenberger tract had been sold for taxes about the year 1820; that he caused the records of the commissioners' office to be examined, but with what result he does not say, but gives us to understand that on account of this information, on his return to his residence, he and his co-administrator examined the papers, and found with the title-deeds, receipts for taxes purporting to be treasurer's receipts for the taxes of the years 1816, 1817, 1818, 1819, 1820, 1821, 1822, 1823 and 1824 for the land. He was not able to state the name of the treasurer or the particulars of the receipts further than that they purported to have been the treasurer's

[McReynolds v. Longenberger.]

receipts for the taxes of those years. When they were burned, together with the title deeds, by the burning of the house of the witness, the receipts for 1818, 1819, 1820 and 1821 were over thirty years old. Would they have been evidence without preliminary proof of execution, had they been produced and offered as such in court? That they would, I think is maintainable on abundant authority.

The rule on this subject is, that when instruments are more than thirty years old, and are unblemished by any alterations, and obtained from the proper custody, they are said to prove themselves, and the bare production thereof is sufficient, the subscribing witnesses, or all living witnesses of the transaction, being presumed to be dead; and this presumption, as far as this rule of evidence is concerned, is not affected by proof that there are witnesses living. But it is essential that it appear that the instrument or instruments come from such custody as to afford a reasonable presumption in favor of their genuineness, and be otherwise free from just grounds of suspicion: Greenl. on Ev. § 21; and for this the learned author cites numerous authorities. The rule is stated in Sharswood's Starkie, p. 292*, thus: "It is in general essential to the reception of ancient instruments of this kind (old surveys, terriers, reports on the temporal rights of clergymen returned into the registry of the bishop), and indeed of all others, whether they be of a *public* or *private nature*, such as public surveys, inquisitions or ancient deeds, that the document should be established by the only kind of proof of which it is in general capable, that is, by proof that it comes out of the proper repository." The same rule, says the learned author, p. 524*, "applies to other old writings, such as receipts and letters," and cites the case of Bear v. Ward, before Dallas, C. J., in 1821, and again before Lord Tenterden in 1823, when an old letter purporting to be signed by the head of the family, and brought from among the title-deeds of the family, was admitted to be read.

In Bertie v. Beaumont, 2 Price 303 (1816), rector's receipts for tithes from 1743 to 1775, were offered, and it was objected that proof should be given of the rector's handwriting, and that the receipts did not come from the proper custody, i. e., from the party to whom given. The reply was, the age of the receipts and their evident connection with the parties and the subject-matter. Thompson, C. B., said, among other things, "They are produced by defendant's solicitor who lives at Buckland, and he says he received them from the defendant for the purpose of preparing the defence;" and "that there is a reasonable inference (because of the occupation of land at Buckland) that they (the defendants) were so connected as to make this the proper custody. Reasonable evidence of proper custody is all that can be required, and is sufficient." Graham, B., concurring with the Chief Baron,

[McReynolds *v.* Longenberger.]

said, " I certainly do not recollect a case where the proof of hand-writing of a rector has ever been dispensed with; but it must often be that receipts go back beyond the memory of living wit-nesses, and there is an instance, I think, of a receipt admitted by Lord Hardwicke, which was seventy-four years old; and if seventy-four years could make it evidence, a much less time might do so." In Bullen *v.* Michel, 2 Price 399, ancient entries of the monks of an abbey, were admitted without proof of handwriting. So in Wynne *v.* Tyrwhitt, 4 B. & Ald. 376, the syllabus of the case is, that entries in a steward's book, when thirty years old, and coming from the proper custody, were held admissible without proving the handwriting of the steward. *Semble*, that the rule applies to all written documents coming from the proper custody. Per Curiam : It is founded on the antiquity of the instrument, and the great difficulty, nay impossibility, of proving the handwriting of the party, after such a lapse of time." Rex *v.* Ryton, 5 Term 259, " a certificate from a chapelry, acknowledging the father of a pauper to be regularly settled in the chapelry, admitted." Per Curiam : " It was sufficient for the respondent barely to produce the certificate to the sessions without proving any account of it." In The Dean of Ely *v.* Stewart, 2 Atkins 44, it was declared by Lord Hardwick, that " when the admittance of a copyholder is of thirty years' standing, a copy of such admittance may be re-ceived, and it is not necessary it should be signed by the steward of the court."

It will be seen by these citations, that papers, other than deeds, accompanied by possession, prove themselves after thirty years, provided they are derived from proper custody. Receipts, let-ters and certificates of church registers and the like, it is shown, prove themselves. The custody raises the presumption, after this lapse of time, of their validity, and stands for primary proof; the law presuming all witnesses to be dead. This is the rule in the cases referred to, and the principle is recognised by this court in Lau *v.* Mumma, 7 Wright 267. Receipts of a private nature exclusively, may not be within the rule—this we do not decide, however—but receipts from a public officer, like a county treasurer, have always, unlike receipts of third parties, been provable without calling the officers. This is because of his public official character; therefore, I do not think it an exten-sion of the principle of the cases, to hold the doctrine applica-ble to treasurer's receipts for taxes. It is an eminently con-servative principle, for proof by living witnesses of a treasurer's handwriting cannot always exist, and there must be some way to supply it, or very great wrongs in many cases might be the consequence. Here, if the witness is accurate, these receipts were at the time of their destruction, within the category of ancient documents, purporting to be over thirty years old, and

[McReynolds v. Longenberger.]

evidence *per se*.    They were in the possession of the proper custodian of the papers, derived from the owner of the estate, who, while in his custody, offered the land in pursuance of an order of the Orphans' Court, for sale, on the faith of them. When the witness was called to testify, had the receipts been present, they would have then been long past thirty years old, and would, under the authority of the cases cited, have spoken for themselves; no legal presumption of the existence of any writings to prove anything about them existing.    That presumption arises at thirty years; and it is on this ground that papers prove themselves.    Was it not therefore competent to prove the destruction of what was at the time of the destruction testimony *per se*, and supply contents by secondary evidence?    If the witness had known the treasurer's handwriting, the receipts being destroyed, it does not admit of a doubt but that he might have testified to the contents.    This on the ground of supplying the best evidence the nature of the case admits of.    The primary evidence having been put out of the power of the party, secondary becomes primary, and to conserve the ends of justice, the law under such circumstances permits it to be given.    Testimony by lapse of time being complete in itself when destroyed, I see not why secondary evidence, first proving its destruction, may not on the same principle be given, as well as such evidence in regard to any other description of testimony.    One species of evidence of writings is made so by antiquity, living witnesses being presumed to be dead, while another is capable only of being evidence by witnesses; being destroyed it is agreed it may be supplied.    It seems to me no just distinction should exist between the admission of the evidence in either case.    The necessity for the rule is the same in both if the loss be proved.    Without further enlarging, we think the rejected deposition, or at least that portion included in the bill of exceptions, should have been admitted for whatever it was worth towards establishing the point for which it was offered.    Mere defect of memory on the part of the witness, was not a reason for rejecting the testimony.    This was a matter for the jury to consider when weighing its credibility. It would be thought remarkable, if a witness should speak definitely about the precise contents of the receipts, after such a lapse of time since their destruction.    That they purported to be treasurer's receipts for the taxes of 1818–19, was the great point of inquiry; the minutiæ of contents operated on the question of the accuracy of the witness; and that was for the jury.

Judgment reversed, and *venire de novo* awarded.